# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
October 9, 2012 Session

## STATE OF TENNESSEE v. CAYETANO RAMIREZ

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2008-C-2573      Mark J. Fishburn, Judge**

---

**No. M2011-01865-CCA-R3-CD     Filed - 05/03/2013**

---

A Davidson County Criminal Court Jury convicted the appellant, Cayetano Ramirez, of attempted rape of a child. The trial court imposed a sentence of ten years in the Tennessee Department of Correction. On appeal, the appellant challenges (1) the trial court's denial of his motion to suppress his statement to police, (2) an alleged Brady violation, (3) the admission of a prior act in violation of Tennessee Rule of Evidence 404(b), and (4) the sufficiency of the evidence sustaining his conviction. Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JERRY L. SMITH and JOHN EVERETT WILLIAMS, JJ., joined.

Jerry Gonzalez, Murfreesboro, Tennessee, for the appellant, Cayetano Ramirez.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Sharon Reddick, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I.  Factual Background

At trial, the victim, S.B.,[1] testified that his birthday was February 24, 1996, and that he lived in Aurora, Colorado, with his mother, his younger brother, and his younger sister. He said that on August 11, 2008, when he was twelve years old, he and his family, including

---

[1] It is the policy of this court to refer to minor victims of sexual crimes by only their initials.

his stepfather, the appellant, came to Nashville for a "Christian assembly." Also with them were his uncle, Antonio Bustamante; Antonio's wife, Monica; and their three children. The victim said that his mother drove most of the twenty-hour trip. When they arrived, the victim and his family ate, set up a tent at Seven Hills campground, and went to sleep in the tent. They were positioned next to each other in the following order: the victim, the appellant, the victim's mother, the victim's brother, and the victim's sister. The victim was wearing a shirt and jeans, and the appellant was wearing a shirt and khaki pants. When the victim started falling asleep, the appellant put his hand under the victim's shirt and touched the skin of his stomach. The appellant then unbuttoned the victim's pants, pulled the victim's pants and underwear down, and touched the victim's buttocks. The victim first said that the appellant's penis almost penetrated his anus, then he stated that the appellant's penis slightly penetrated his anus. The victim said that the appellant's actions made him feel "[r]eally gross." He stated something that felt and smelled like urine came out of the appellant's penis.

The victim said that his mother saw the blankets moving, pulled back the covers, and began yelling. Mr. Bustamante came in the tent and asked what had happened. The victim's mother and Mr. Bustamante made the other children leave the tent, and the victim's mother called the police. Mr. Bustamante asked the victim what happened. The victim did not reveal everything the appellant had done because he was too shocked to talk.

The victim said that the police and his mother took him to the hospital for an examination. When he arrived, a lady asked him a lot of questions, and he told her everything he could remember.

On cross-examination, the victim said that there was a light in the tent but that it was turned off when they went to bed. He stated that when the police arrived, he told them about the incident. He told police that the appellant had touched and abused him.

The victim's mother[2] testified that she met the appellant in 2006 and that they married in 2007. She denied that the appellant had ever expressed concern about the victim's sexuality. The victim's mother said that her older brother, Mr. Bustamante, was pastor of the church she attended in Colorado. She stated that in 2008, she, the appellant, her children, Mr. Bustamante, Mrs. Bustamante, and Mr. Bustamante's children came to Nashville to attend an assembly that was to be held from August 12 through August 17. She said that they drove in two vans; one was driven by Mr. Bustamante, and she drove the other van most of the time. They were staying at a campground and arrived at approximately 9:30 p.m. The victim's family put up a tent, with sleeping bags and blankets inside, and lay down to sleep. In the tent, they slept beside each other in the following order: the victim, the appellant, the

---

[2]The testimonies of the victim's mother and Antonio were translated by an interpreter.

victim's brother, the victim's mother, and the victim's sister. Mr. Bustamante's family was sleeping in a trailer parked beside the tent.

The victim's mother said that she was tired and fell asleep. She woke and saw the blankets moving in a way that "wasn't good." She pulled back the blankets and saw that both the appellant and the victim had their pants down. The appellant's penis was erect. The victim's mother asked the appellant "why have you done this?" She said the appellant responded "that my son wanted it." The victim's mother screamed for Mr. Bustamante, who immediately came to the tent. He spoke with the victim and the appellant, and the victim's mother called the police.

When the police arrived, the victim's mother and Mr. Bustamante spoke with them. The victim's mother said that the police spoke in both Spanish and English. She said that all of the children except the victim stayed asleep. At the suggestion of police, the victim was taken to the hospital for an examination. The victim was given HIV preventative medicine, which made him dizzy and made him vomit.

The victim's mother said that she had not seen the appellant since the incident; however, he had written her letters, and they had spoken by telephone about five times. She maintained that she had contact with the appellant to try to get more information from him and to try to get him to confess. She said that in his letters, the appellant said that she should not talk to the State so that he could be released. He also asked her to change her address and telephone number so the State could not find her. Eventually, the victim's mother decided that she could not get the information she wanted from the appellant, and she asked him to stop contacting her.

On cross-examination, the victim's mother acknowledged that when she called 911, she said that her husband was abusing her son but that she did not give any further details. She said that she was not calm during the call and that she was in shock. She said that she was still married to the appellant and that she wanted a divorce.

Antonio Bustamante testified that he was a pastor for the Iglesia De Dios De La Profecia, which was the Church of God of Prophecy, an international Christian denomination. In August 2008, he and his family, as well as the victim's mother and her family, came to Nashville and stayed at a campground so they could attend an "international assembly." He brought a trailer for his family to sleep in and parked it beside the tent in which the victim's family slept. Shortly after everyone went to sleep, he heard the victim's mother call for him. Concerned, he ran to help her. The victim's mother was crying, told him the appellant was abusing her son, and asked him to call the police. Mr. Bustamante went inside the tent and saw the appellant standing up with his pants down around his thighs.

-3-

He asked the appellant "for an explanation." The appellant, who sounded nervous, replied that nothing happened.

Mr. Bustamante took the victim aside and asked what had happened. The victim was crying, upset, and frightened. He indicated that he did not want to talk about it but revealed that the appellant had touched him. The victim's mother called police, and she and Mr. Bustamante spoke with them after they arrived.

On cross-examination, Mr. Bustamante said that they went to sleep around 10:00 p.m. and that he heard the victim's mother yell about an hour or an hour and fifteen minutes later. He acknowledged that he told police the appellant's pants were around his ankles. He explained that it was dark. Mr. Bustamante said that he previously told a private investigator that the appellant was sitting when Mr. Bustamante went into the tent. He remembered that the appellant was sitting or kneeling.

Julie Elizabeth Rosof-Williams testified that at the time of the offense, she was a nurse practitioner at the Our Kids Center and that she performed examinations on children when there were allegations of sexual assault. On August 12, 2008, she examined the victim. During the examination, the victim was shy, anxious, and nervous. She found no visible evidence of sexual assault. She explained that the anus is elastic and may be penetrated without causing injury. She stated that the lack of visible injury was common in examinations for sexual abuse and that her findings did not discount the possibility of the victim being penetrated.

Rosof-Williams stated that after discussions with the victim's mother about the appellant's sexual history, the decision was made to place the victim on medication to reduce his risk of contracting HIV and to prevent other sexually transmitted diseases. She said that weakness, nausea, and vomiting were side effects of the medication.

Jaha Martin testified that on August 12, 2008, she was a social worker at the Our Kids Center and that she interviewed the victim. The victim was wrapped in a blanket and was shaking. He appeared shy, hesitant, and nervous. The victim told Martin that he and his family had arrived in town and were staying at a campground when "'[s]omething pervertical (sic)'" happened. Eventually, he disclosed that the appellant's penis touched his butt "on the inside." He did not report anything that made Martin believe the appellant had ejaculated.

Dylan Thomas Kinney testified that on August 11, 2008, he was an officer with the patrol division of the Metropolitan Nashville Police Department (Metro). He was working the midnight shift, which included hours from 10:30 p.m. to 7:00 a.m., when he was called to respond to the Seven Points Campground at 1810 Stewarts Ferry Pike. He arrived at the

scene around midnight and saw the victim sitting quietly on the steps of a parked camper.

The victim's mother spoke with Officer Kinney. Officer Kinney said that he was able to speak some Spanish but that he was not fluent. He said that the victim's mother "spoke fairly good English," explaining that she spoke mostly in English. He said that she had trouble with a few words, but he was able to understand most of what she said. She told him that she felt the covers move, pulled the covers back, and saw "what was going on." Officer Kinney also spoke with Mr. Bustamante, who said that he was awakened by the victim's mother in the middle of the night. Mr. Bustamante said that when he saw the appellant, his pants were down. Thereafter, Officer Kinney took the appellant into custody and placed him in the back of the patrol car. He contacted Detective Terry from the sex crimes unit to take over the case. Later, Officer Kinney took the victim and his mother to the hospital.

On cross-examination, Officer Kinney said that Mr. Bustamante told him that the appellant's pants were down around his ankles. He did not recall the victim's mother saying that she had seen the appellant with an erection.

Metro Detective Jason Terry testified that in August 2008, he was assigned to the sex crimes unit and that he went to the campground. When he arrived, he saw Officers Bridget Griepentrog, Stephen Jenkins, and Kinney. He also saw the victim's mother, Mr. Bustamante, the victim, and the appellant. Detective Terry spoke with the victim's mother, who told him that she saw the appellant with his pants down and with an erection "spooning" behind the victim, whose pants were also down. Detective Terry said that the victim's mother was upset and spoke in both Spanish and English. Officer Kinney helped translate the Spanish words Detective Terry did not understand. Detective Terry also spoke with Mr. Bustamante, who said that he saw the appellant's pants "lowered."

Detective Terry said that the victim's mother took the victim to the hospital for an examination. Based upon the victim's report of penile/anal penetration, a rape kit was performed. Detective Terry took the swabs from the kit to the Tennessee Bureau of Investigation (TBI) for testing; however, nothing of evidentiary value was found.

While the victim was at the hospital, Detective Terry talked with employees of the Department of Children's Services (DCS). He also contacted representatives from Our Kids Center and asked them to go to the hospital. Detective Terry then returned to the scene and directed the collection of evidence by the crime scene technicians. Afterward, he went to the sex crimes unit's office to interview the appellant. He said that the interview occurred approximately three or three and a half hours after he responded to the scene.

Because the appellant spoke only Spanish, Detective Terry asked Officer Jeff Gibson

to translate. Detective Terry said that the appellant's demeanor was calm during the interview, even after Detective Terry accused him of raping the victim. Detective Terry told the appellant that there might be medical proof of the rape and suggested that the victim might be responsible. He explained that misrepresenting information is a common tactic used by police during an interrogation.

Detective Jeffrey Gibson testified that he assisted Detective Terry with the August 12, 2008 interview of the appellant by translating. Detective Gibson said he spoke fluent Spanish, noting that he majored in Spanish in college and that he taught Spanish to high school students and new police academy recruits.

A transcript of the interview was read for the jury. During the interview, the appellant said that he, the victim's mother, and her children came to Nashville for a Christian fellowship. The appellant denied having sex with the victim. He said that he had driven for a long time, perhaps sixteen hours, and was tired. He fell asleep and woke to find the victim grabbing his penis. He maintained that at first, he thought the victim's mother was touching him. The appellant said that the victim had pulled his and the appellant's pants down, that the appellant's penis was exposed, and that the victim was on top of the appellant. He estimated that the touching lasted about a minute. When the victim's mother woke, he told her that "it's your son." The appellant said that the victim was sleeping on his side, next to the appellant and that the appellant was lying on his back.

The appellant said that the victim had previously touched him in a sexual way one and one-half months earlier in Colorado. The appellant said that he thought the victim was homosexual and that the victim had been raised by a homosexual uncle.

The appellant was convicted of the lesser-included offense of attempted rape of a child and was sentenced to ten years in the Tennessee Department of Correction. On appeal, the appellant challenges the trial court's denial of his motion to suppress his statement to police, an alleged Brady violation, the admission of a prior act of the appellant in violation of Tennessee Rule of Evidence 404(b), and the sufficiency of the evidence sustaining his conviction.

## II. Analysis

### A. Suppression of Statement

The appellant contends that the trial court erred in denying his motion to suppress his statement to the police. The appellant specifically complains that his statement should be suppressed because (1) the officers did not have probable cause to arrest him without a

warrant, thereby tainting his subsequent statement; (2) the police lied to the appellant and deprived him of food, water, and sleep, making the environment so coercive that the statement was involuntary; and (3) that the police delayed taking the appellant to a magistrate for a determination of probable cause in order gather additional evidence to justify the appellant's arrest.

In reviewing a trial court's determinations regarding a suppression hearing, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." Id. Nevertheless, appellate courts will review the trial court's application of law to the facts purely de novo. See State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001). Furthermore, the State, as the prevailing party, is "entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." Odom, 928 S.W.2d at 23. Moreover, we note that "in evaluating the correctness of a trial court's ruling on a pretrial motion to suppress, appellate courts may consider the proof adduced both at the suppression hearing and at trial." State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998).

At the suppression hearing, Officer Jenkins testified that when he responded to the Seven Points Recreation Center on August 11, 2008, he and Officer Kinney, who spoke Spanish, talked with the victim's mother. Officer Jenkins said that the victim's mother spoke mostly Spanish, and the rest of the time used "broken" English. Mr. Bustamante, who spoke English well, also translated for the victim's mother. The victim's mother said that she, her three children, and the appellant were staying in a tent at the campground. Mr. Bustamante and his wife were staying in a camper trailer next to the tent. While sleeping in the tent, the victim's mother was awakened by a lot of movement under the blankets, and she pulled the blankets back. She saw the appellant "spooning" behind the twelve-year-old victim. The victim's mother said that both the appellant and the victim had their pants down around their knees, that the appellant's penis was erect, and that the appellant was sodomizing the victim. Officer Jenkins said that he thought the victim's mother meant that the appellant was lying on his side behind the victim with his groin area against the victim's buttocks. Officer Jenkins understood "sodomized" to mean penile/anal penetration.

On cross-examination, Officer Jenkins said that Officer Kinney was no longer employed with Metro and that he did not know where he was. Officer Jenkins said that he had taken Spanish classes but that he was not sufficiently fluent to understand the conversation. Officer Jenkins stated that he arrived at the campground at approximately 1:30 a.m.

Detective Terry testified that in August 2008, he was assigned to the sex crimes unit. He said that he could find Officer Kinney but did not know his current whereabouts. At approximately 11:45 p.m. on the night in question, Officer Kinney contacted him about allegations that the victim had been sexually abused. When Detective Terry arrived on the scene, the appellant was in handcuffs and was sitting in the back of Officer Kinney's car. Detective Terry said that after speaking with the witnesses at the scene, he believed that there was sufficient probable cause to place the appellant in custody. Detective Terry said that he spoke with the victim's mother, that she was upset and spoke "broken" English, and that he could nevertheless understand her "for the most part." Additionally, Officer Kinney provided translation for the words he could not understand. The victim's mother said that while she, the appellant, and her three children were sleeping in a tent, she awoke and felt the covers moving. When she pulled the covers down, she saw the appellant, whose pants were lowered, lying behind the victim, whose pants were also lowered. She saw that the appellant had an erection, and she believed he was sodomizing the victim. She screamed and left the tent, and Mr. Bustamante came out of the trailer. Then, the victim's mother called the police.

Detective Terry spoke with Mr. Bustamante, who said that he was awakened by the victim's mother's screaming. Mr. Bustamante saw the appellant with his pants down. Mr. Bustamante confronted the appellant, and the appellant denied any wrongdoing.

Detective Terry recalled that all of the children were in the trailer with Mr. Bustamante's wife while he was at the scene. At one point, the victim came out of the trailer, and Detective Terry briefly spoke with him. The victim was withdrawn, but he pointed out the area of the tent where he and the appellant had been sleeping. Detective Terry said he spoke to the victim in vague terms so as not to ask leading questions. He asked if the victim knew why police were there, and the victim said yes. When Detective Terry asked if something similar had occurred before, the victim said that it had happened many times. Detective Terry said that he did not feel comfortable questioning the victim further.

Detective Terry said that as lead detective, he was responsible for supervising the investigation. He said that the victim's mother agreed to take the victim to the hospital for an examination, and he arranged for her to have transportation. He then instructed Officer Grepentrog to take the appellant to the sex crimes unit's office for Detective Terry to interview him. Detective Terry called the crime scene unit to the scene to collect evidence. He then drove to the hospital and ensured that a representative from the Our Kids Center had been contacted. After confirming that the necessary personnel were attending to the victim, Detective Terry returned to the scene, met with crime scene Officer Chip Linville, and told Officer Linville what needed to be collected. Additionally, Detective Terry arranged for Officer Gibson, who spoke fluent Spanish, to come to the sex crimes unit's office to translate for the non-English-speaking appellant. Thereafter, Detective Terry went to the office to

-8-

interview the appellant.

Detective Terry said that the drive from the campground to the hospital and back took approximately thirty to forty minutes. He stated that the appellant was taken into custody at approximately midnight and that he began interviewing the appellant at 3:30 a.m. Detective Terry asserted that from the time the appellant was taken into custody until he interviewed the appellant, Detective Terry did nothing unrelated to the case. He explained that he wanted to interview the appellant to "complete[] the circle" and get information from all the parties with direct knowledge of events. After the interview, Detective Terry went to a magistrate to obtain an arrest warrant. Nothing in the affidavit underlying the arrest warrant was gleaned from Detective Terry's interview with the appellant.

Detective Terry said that his interview with the appellant was video recorded. Officer Gibson was also present for the interview, which lasted an hour and thirty-nine minutes. The first ten or fifteen minutes were devoted to ensuring that the appellant understood his rights and administering the Miranda warnings, which the appellant waived. The last fifteen or twenty minutes of the interview, Detective Terry explained the charges and informed the appellant what would happen next. Detective Terry estimated that the actual interview lasted approximately one hour. About forty-five minutes into the interview, the appellant asked to go to the restroom. Detective Terry asked him to "'hang on a minute,'" and three minutes later, the appellant was taken to the restroom. The appellant did not ask for anything to eat or drink. Detective Terry said that he would have provided a drink but that he preferred to not provide food during the interview. However, he would have made sure that if the appellant were hungry, he would have been provided food before or after the interview.

During the interview, the appellant repeatedly stated that he was tired and explained that he had driven from Aurora, Colorado, to Nashville without stopping, which was a sixteen-hour drive. The appellant said that they arrived around 7:00 p.m. The appellant never said that he was too tired to answer questions, and Detective Terry thought the appellant meant that he was tired at the time the events transpired.

Detective Terry said the appellant blamed the victim for the sexual contact, stating that he awoke to find the victim masturbating. He repeatedly denied having sex with the victim. The appellant also stated that a prior sexual contact occurred in Colorado. The appellant said that he thought the victim was homosexual. The appellant also indicated that he had initially thought his wife was "masturbating him."

On cross-examination, Detective Terry acknowledged that he did not know who handcuffed the appellant, but he assumed it was Officer Kinney because the appellant was in the back of Officer Kinney's car. Detective Terry said he received the information

regarding the penile/anal contact and the appellant's erection from the victim's mother, but he could not recall the specific wording she used.

Detective Terry said that although he had probable cause to arrest the appellant, he decided to have the appellant taken to the sex crimes unit for questioning instead of taking him to a magistrate for a judicial determination of probable cause. Detective Terry said that there was an approximately a six-and-one-half hour delay between the appellant's being taken into custody shortly before midnight and the judicial commissioner issuing the arrest warrant at 6:37 a.m. He said that all of the information in the affidavit underlying the search warrant came from the victim's mother.

Detective Terry said that the appellant asked if he could sleep in the interview room, and the interview ended shortly thereafter. Detective Terry acknowledged that in the interview, the appellant used the word "touching," not the word "masturbating."

### 1. Warrantless Arrest

The appellant first complains that his warrantless arrest was not supported by probable cause. Tennessee Code Annotated section 40-7-103(a)(3) provides that an officer may arrest a person without a warrant "[w]hen a felony has in fact been committed, and the officer has reasonable cause for believing the person arrested to have committed it." See also State v. James David Moats, __ S.W.3d __, No. E2010-02013-SC-R11-CD, 2013 WL 1181967, at *4 (Tenn. at Knoxville, Mar. 22, 2013); State v. Echols, 382 S.W.3d 266, 278 (Tenn. 2012).

The appellant was under arrest when he was handcuffed and placed in the back of a police car. See State v. Crutcher, 989 S.W.2d 295, 301-02 (Tenn. 1999). Moreover, the appellant was arrested for rape of a child, which is a Class A felony. See Tenn. Code Ann. § 39-13-522(b). Thus, our next inquiry is whether police had probable cause to believe that the appellant committed the offense. See State v. Lewis, 36 S.W.3d 88, 98 (Tenn. Crim. App. 2000). Our supreme court has explained that "a reasonable ground for suspicion, supported by circumstances indicative of an illegal act," constitutes probable cause. State v. Henning, 975 S.W.2d 290, 294 (Tenn. 1998).

Courts should determine the existence of probable cause after assessing all of the information available to the officer at the time of arrest. See State v. Woods, 806 S.W.2d 205, 212 (Tenn. Crim. App. 1990). To this end, Tennessee Rule of Criminal Procedure 4(b) provides that in the application for the issuance of an arrest warrant, "[t]he finding of probable cause shall be based upon evidence, which may be hearsay in whole or in part provided there is a substantial basis for believing the source of the hearsay to be credible and for believing that there is a factual basis for the information furnished." It has long been

-10-

established that "[w]hile this rule applies itself particularly to warrants for arrest, the same principle must be considered applicable to establish probable cause where an arrest has been made without a warrant." State v. Raspberry, 640 S.W.2d 227, 228 (Tenn. Crim. App. 1982); see also State v. Tays, 836 S.W.2d 596, 600 (Tenn. Crim. App. 1992).

This court has observed that the "probable cause requirement [included in Rule 4(b)] essentially encompasses the Aguilar-Spinelli two-pronged test adopted by our Supreme Court in State v. Jacumin [778 S.W.2d 430 (Tenn. 1989)]." Tays, 836 S.W.2d at 600; see also Spinelli v. United States, 393 U.S. 410 (1969); Aguilar v. Texas, 378 U.S. 108 (1964). In other words, the hearsay statement relied upon by police must establish the informant's basis of knowledge and demonstrate the informant's reliability. However, our courts have also noted that the Aguilar-Spinelli test does not apply to "citizen informants." See State v. Luke, 995 S.W.2d 630, 636 (Tenn. Crim. App. 1998).

The testimonies of Officer Jenkins and Detective Terry reveal that the victim's mother told the officers that she was awakened by the blankets moving, that saw the appellant lying behind the twelve-year-old victim, that he and the victim both had their pants down, that the appellant had an erection, and that he appeared to be sodomizing the victim. The officers stated that Mr. Bustamante, the victim's uncle, confirmed that when he entered the tent immediately after the victim's mother called for help, the appellant's pants were lowered. The victim acknowledged that he knew why the police were there and that he had been abused by the appellant many times before. The victim, the victim's mother, and Mr. Bustamante were citizen informants entitled to a presumption of credibility. See State v. Carter, 160 S.W.3d 526, 534 (Tenn. 2005). We conclude that from the foregoing, the police had probable cause to arrest the appellant for rape of a child.

## 2. Voluntary Statement

The appellant next argues that his statement was given only after the police lied to him and deprived him of food, water, and sleep, which created a coercive environment. The Fifth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution generally provide a privilege against self-incrimination to individuals accused of criminal activity, thus necessitating our examination of the voluntariness of a statement taken during custodial interrogation. State v. Callahan, 979 S.W.2d 577, 581 (Tenn. 1998). Specifically, for a confession to be admissible, it must be "'free and voluntary; that is, [it] must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence. . . .'" State v. Smith, 933 S.W.2d 450, 455 (Tenn. 1996) (quoting Bram v. United States, 168 U.S. 532, 542-43 (1897)). We note that if, prior to making a statement, the police inform the accused of his Miranda rights and the accused proceeds to knowingly and voluntarily waive those

-11-

rights, the statement is then admissible against the accused due to the valid waiver of the privilege against self-incrimination. Callahan, 979 S.W.2d at 581 (citing Miranda v. Arizona, 384 U.S. 436, 444-45 (1966)). Again, in reviewing a trial court's ruling on a motion to suppress, we will uphold the trial court's findings of fact unless the evidence preponderates otherwise. State v. Hicks, 55 S.W.3d 515, 521 (Tenn. 2001).

"In determining whether a confession has been made knowingly and voluntarily, courts must look to the totality of the circumstances." State v. Smith, 42 S.W.3d 101, 109 (Tenn. Crim. App. 2000). Accordingly, we consider the following factors in determining the voluntariness of a confession: the appellant's age; education or intelligence level; previous experience with the police; the repeated and prolonged nature of the interrogation; the length of detention prior to the confession; the lack of any advice as to constitutional rights; the unnecessary delay in bringing the appellant before the magistrate prior to the confession; the appellant's intoxication or ill health at the time the confession was given; deprivation of food, sleep, or medical attention; any physical abuse; and threats of abuse. See State v. Huddleston, 924 S.W.2d 666, 671 (Tenn. 1996). Furthermore, this court has stated:

> Coercive police activity is a necessary prerequisite in order to find a confession involuntary. The crucial question is whether the behavior of the state's officials was "such as to overbear [the appellant's] will to resist and bring about confessions not freely self-determined." The question must be answered with "complete disregard" of whether or not the accused was truthful in the statement.

State v. Phillips, 30 S.W.3d 372, 377 (Tenn. Crim. App. 2000) (citations omitted).

At the suppression hearing, Detective Terry testified that he interviewed the appellant approximately three or three and one-half hours after the appellant was taken into custody. During the first ten or fifteen minutes of the interview, Detective Terry advised the appellant of his Miranda rights, and the appellant waived his rights. Although the appellant claimed that he was denied bathroom breaks, Detective Terry testified that the appellant asked to go to the bathroom, and the police allowed the break. Detective Terry said that the appellant did not ask for food or drink; however, he would have supplied a drink during the interview and food before or after the interview. The appellant told the police that he was tired but never said that he was too tired to answer questions. Further, Detective Terry understood that the appellant was saying that he was tired at the time the events transpired. Additionally, the appellant told Detective Terry that he had slept "the whole time in . . . the patrol car" and napped in the interview room. Although the appellant complains that the police lied to him,

-12-

he does not specifically state what lies were told to him. See Tenn. Ct. Crim. App. R. 10(b); Tenn. R. App. P. 27(a)(7). Regardless, "[a] police misrepresentation alone does not invalidate an otherwise voluntary [statement]." State v. Stearns, 620 S.W.2d 92, 96 (Tenn. Crim. App. 1981); (citing Frazier v. Cupp, 394 U.S. 731, 739 (1969)). Moreover, the appellant did not testify at the hearing regarding the alleged coercive activity of the police. There was no proof of physical abuse or threats of abuse. In sum, based on the totality of the circumstances, we conclude that the trial court did not err in finding that the appellant's statements were voluntary. Accordingly, we conclude that the appellant is not entitled to relief.

### 3. Unnecessary Delay in Presenting to Magistrate

The appellant maintains that the police unnecessarily delayed taking him before a magistrate for a judicial determination of probable cause; therefore, his statement should be suppressed. The appellant asserts that the delay was for the purpose of allowing the police to gather additional evidence to justify his arrest. Specifically, the appellant contends that he was taken to the sex crimes unit instead of a magistrate solely for the purposes of obtaining a confession. The State asserts that the police had probable cause to arrest the appellant before he gave a statement and that there was no unreasonable delay in taking the appellant before a magistrate. We agree with the State.

Rule 5(a) of the Tennessee Rules of Criminal Procedure provides:

> Any person arrested except upon a capias pursuant to an indictment or presentment shall be taken without unnecessary delay before the nearest appropriate magistrate of the county from which the warrant for arrest issued, or the county in which the alleged offense occurred if the arrest was made without a warrant unless a citation is issued pursuant to Rule 3.5.

In the event of a warrantless arrest, the Fourth Amendment requires a prompt judicial determination of probable cause as a prerequisite to the extended detention of an individual. State v. Carter, 16 S.W.3d 762, 765 (Tenn. 2000).

In the instant case, there was a delay of approximately six or six and one-half hours between the appellant's arrest and his appearance before a magistrate for a judicial

-13-

determination of probable cause. Generally, "a judicial determination of probable cause is 'prompt' if it occurs within 48 hours." Carter, 16 S.W.3d at 765. Detective Terry explained that during the six and one-half hours between the appellant's arrest and his appearance before a magistrate, Detective Terry performed other functions related to the arrest, including interviewing witnesses on the scene, arranging for the victim to be taken to the hospital for an examination, instructing the crime scene officers on the evidence to gather, and interviewing the appellant. He also states that none of the information obtained during the interview of the appellant was used in his affidavit in support of probable cause. As the State notes, the police had probable cause to arrest the appellant prior to his interview at the police station. Moreover, the appellant presented no evidence to show that the delay between his arrest and his appearance before a magistrate was unreasonable. This issue is without merit.

## B. Brady Violation

The appellant maintains that the State committed a Brady violation by failing to disclose evidence of the victim's mental condition, specifically autism. He contends that the victim's testimony was the bulk of the evidence against the appellant; therefore, evidence of the victim's mental health issues were pertinent to his credibility. Further, he maintains that the State was aware of the victim's condition and had a duty to disclose it to the defense. The State maintains that the appellant failed to establish that the victim had a mental condition, failed to establish that the State suppressed the evidence, and failed to establish that the evidence was material. We agree with the State.

In Brady v. Maryland, 373 U.S. 83, 87 (1963), the United States Supreme Court held that the State has a constitutional duty to furnish the defendant with exculpatory evidence pertaining to the defendant's guilt or innocence or to the potential punishment faced by the defendant. Specifically, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Id. The State's duty to disclose exculpatory evidence extends to evidence which may be used by the accused for impeachment purposes. Giglio v. United States, 405 U.S. 150, 154-55 (1972).

In order to prove that a violation exists, a defendant must show that (1) he requested the information (unless the evidence is obviously exculpatory, in which case the State is obligated to release such evidence regardless of whether or not it was requested); (2) the State suppressed the information; (3) the information was favorable to the defendant; and (4) the information was material. State v. Edgin, 902 S.W.2d 387, 390 (Tenn. 1995). Evidence

is favorable if it "'provides some significant aid to the defendant's case, whether it furnishes corroboration of the defendant's story, calls into question a material, although not indispensable, element of the prosecution's version of the events, or challenges the credibility of a key prosecution witness.'" Johnson v. State, 38 S.W.3d 52, 56-57 (Tenn. 2001) (quoting Commonwealth v. Ellison, 379 N.E.2d 560, 571 (Mass. 1978)). Generally, "[e]vidence is deemed to be material when 'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" Johnson, 38 S.W.3d at 58 (quoting Edgin, 902 S.W.2d at 390). The appellant bears the burden of proving a Brady violation by a preponderance of the evidence. Edgin, 902 S.W.2d at 390.

The appellant first raised this issue at the hearing on the motion for new trial. At the hearing, Daniel Mann, an alternate juror who did not participate in deliberations, testified that he had two autistic sons and that he noticed the victim's speech and physical movements were similar to those of his autistic children. Specifically, Mann noted that the victim spoke in a monotone and walked with his hands directly at his sides. Mann said that when the victim was being sworn at trial, he had to be repeatedly told to raise his right hand. Mann stated that his overall view of the victim was that he was "very reminiscent of an autistic, somewhere along the spectrum." Mann maintained that an autistic person's "perceptions are not always accurate and factual." He asserted that the victim "may have been touched at one point in time in his life and he may have been penetrated. But as far as him being a credible witness about that one point in time, he wasn't a credible witness if he had autism." Mann acknowledged that he was not a doctor and that he was not capable of diagnosing autism.

Mann said that after he was dismissed from jury service, he met with the trial judge, who thanked Mann for his service. Mann stated that "the discussion was the prosecution just got a big favor because . . . I would have hung the jury because I didn't find [the victim to be] a credible witness . . . because of my experience with autism." Mann asked the judge why the jury was not instructed that the victim was autistic. The judge responded that he was not aware that the victim was autistic. Mann said that a court officer stepped forward and said that the prosecutor had asked him, "[D]on't you just love my witness, he's – I think he's mildly retarded, but he's just so sweet."

On cross-examination, Mann reiterated his opinion that "there was something not right with that boy." Mann acknowledged that he told a court officer that he would not have convicted the appellant because one of Mann's autistic sons had a tendency to "act out sexually." Mann conceded that the only exposure he had to the victim was seeing him in court. He also conceded that the victim could have been confused about his right and left hands because he was nervous.

-15-

The court officer, Julianne Smith, testified that she did not recall the prosecutor saying anything about the victim being retarded. Smith recalled that the prosecutor said that she had strong feelings toward the victim because he was a "nice kid."

The prosecutor advised the court that along with a victim impact statement, the victim's mother had provided the victim's medical records. The prosecutor noted that at the sentencing hearing, the trial court stated that the records appeared to show that the victim "may have had some other issues beyond the victimization." However, the State disputed the accuracy of that opinion, noting that the medical records did not reflect any "medical history that's significant with regard to any kind of diagnosis." The prosecutor maintained that there was nothing in the medical records to exculpate the appellant.

Emily Menke, a witness coordinator for the district attorney general's office, testified that she was fluent in Spanish and that she spoke with the victim's mother by telephone. Menke said that the victim's mother never gave any information to the State that suggested the victim had autism or any other diagnosed mental illnesses. However, the victim's mother did tell Menke that the victim was in therapy as a result of the molestation. Menke stated that because the victim and his family lived in Colorado, she and the prosecutor spoke to him once over the telephone and saw him in person for the first time one day prior to trial. At that meeting, Menke saw nothing suggesting that the victim was autistic, mentally disturbed, or otherwise incompetent to testify.

At the conclusion of the hearing, the court acknowledged that mental health issues are relevant to the credibility of a witness but stated that there was no evidence that the victim had any mental health issues prior to the offense.[3] The court also stated that if evidence of the victim's medical counseling was admitted, the jury would have discovered the underlying cause, i.e., the molestation. The court found that the prejudicial effect of the evidence would have outweighed any probative value. Moreover, the trial court said that the jury, like Mann, could have "picked up on" any of the victim's potential mental health issues. Therefore, the court found that the State did not commit any Brady violations.

On appeal, the appellant maintains that the State should have made him aware of the victim's possible autism or retardation. However, as the trial court noted, there is nothing in the record that indicates the victim suffered from autism or mental illness. Although Mann

_____

[3]The trial court stated that a medical record was made an exhibit to the sentencing hearing; however, the appellate record does not contain the medical record.

-16-

testified that the victim displayed characteristics consistent with autism, the appellant has not provided proof of such a diagnosis. Further, Smith refuted Mann's claim that the prosecutor referred to the victim as "retarded." Additionally, Menke testified that nothing in the investigation suggested that the victim suffered from a mental defect. There was also no evidence that the State was aware the victim suffered from autism or mental illness. Moreover, the appellant failed to prove why such evidence was material. We conclude that the appellant has failed to prove a Brady violation, and he is not entitled to relief on this issue.

## C. Evidence of Prior Acts

During trial, the appellant objected to the admission of an unredacted transcript of his statement to police. Specifically, the appellant objected to the portion of the statement in which he disclosed that the victim had touched him in a sexual manner while they were living in Colorado prior to the instant offense. The appellant argued that the contested statement revealed a prior act of the appellant, namely that "when sexual activity between him and the child had occurred, he would claim that it was the child touching him, not the other way around," and was therefore inadmissible under Tennessee Rule of Evidence 404(b). In response, the State maintained that the statement concerned the *victim's* prior acts, not the appellant's, which renders Rule 404(b) inapplicable. The State asserted that the statement was relevant to the credibility of the appellant's version of events. In particular, the State said, "The purpose of bringing this material in is to show the absurdity of his version of what – his explanation for what [the victim's mother] saw . . . with her own two eyes."

The trial court overruled the objection, stating that it did not think that the contested statement "technically" fell under the auspices of Rule 404(b) because it concerned the acts of the victim, not the appellant. Moreover, the court implicitly accredited the State's argument that the statement was probative of the appellant's credibility. However, the court expressed concern that the jury would think the appellant had previously blamed the victim for sexual acts and had "gotten away with it." Therefore, the trial court decided to give a limiting instruction, cautioning the jury that it could consider the references to the Colorado incident for only two purposes: the appellant's mental state on the night of the instant offenses and the appellant's credibility.

Generally, the admissibility of evidence lies within the sound discretion of the trial court, and an appellate court will not interfere with the lower court's exercise of that discretion absent a clear showing of abuse. State v. Carruthers, 35 S.W.3d 516, 574 (Tenn.

2000). The trial court's discretion in determining the admissibility of evidence is generally circumscribed by the Tennessee Rules of Evidence, including evidentiary rules of relevance. Tennessee Rule of Evidence 402 provides that "[a]ll relevant evidence is admissible except as [otherwise] provided. . . . Evidence which is not relevant is not admissible." "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401; see also State v. Kennedy, 7 S.W.3d 58, 68 (Tenn. Crim. App. 1999). However, even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

Tennessee Rule of Evidence 404 provides:

> (b) Other Crimes, Wrongs, or Acts. - Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:
>
> (1) The court upon request must hold a hearing outside the jury's presence;
>
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
>
> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
>
> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

See also State v. Thacker, 164 S.W.3d 208, 240 (Tenn. 2005), State v. Parton, 694 S.W.2d 299, 302 (Tenn. 1985). A trial court's decision regarding the admission of Rule 404(b)

evidence will be reviewed under an abuse of discretion standard; however, "the decision of the trial court should be afforded no deference unless there has been substantial compliance with the procedural requirements of the Rule." State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997).

A leading treatise has explained that "Rule 404(b) is used most frequently by the prosecution in a criminal case to prove another act of the accused." Neil P. Cohen et al. Tennessee Law of Evidence § 4.04[7][a] (LEXIS publishing, 6th ed. 2011). However, "proof of such acts of people other than the criminal accused . . . are to be assessed under the more liberal standards of Rule 401 rather than Rule 404(b)." Id.; see also State v. Stevens, 78 S.W.3d 817, 837 (Tenn. 2002); DuBose, 953 S.W.2d at 653.

In the instant case, the appellant's statement provided that while at the campground in Nashville, the victim touched the appellant's penis while the appellant was asleep. The appellant maintained that in Colorado approximately one and one-half months prior to the campground incident, the victim had touched the appellant in a sexual manner while the appellant was asleep. Thus, the appellant asserted that the victim, not the appellant, initiated the acts in question and that the appellant was completely innocent of all wrongdoing. Because the statement concerned acts committed by someone other than the appellant, Rule 404(b) was inapplicable. See State v. Rogers, 188 S.W.3d 593, 612-13 (Tenn. 2006).

Accordingly, the admissibility of the evidence must be assessed under the provisions of Rules 401, 402, and 403, which provide that relevant evidence is admissible unless the probative value is substantially outweighed by prejudice against the appellant. The State argued that the "absurdity" of appellant's statement regarding the prior incident was relevant to his credibility at trial. The appellant's guilt of the instant offenses depended largely upon the jury's credibility determination regarding the appellant, the victim, the victim's mother, and Mr. Bustamante. Although the fact that there was more than one incident of sexual touching was prejudicial, the appellant's assertion that the victim was responsible for the touching was not substantially more prejudicial than probative. Accordingly, the appellant is not entitled to relief on this issue.

D. Sufficiency of the Evidence

As his final issue, the appellant challenges the sufficiency of the evidence supporting his conviction for attempted rape of a child. On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the

appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

Rape of a child is the "unlawful sexual penetration of a victim by the defendant . . . if the victim is more than three (3) years of age but less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-522(a). "'Sexual penetration' means sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." Tenn. Code Ann. § 39-13-501(7). A criminal attempt occurs when a person acting with the kind of culpability otherwise required for the offense:

> (1) Intentionally engages in action or causes a result that would constitute an offense if the circumstances surrounding the conduct were as the person believes them to be;

> (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or

> (3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Tenn. Code Ann. § 39-12-101(a)(1)-(3).

In the light most favorable to the State, the evidence revealed that the appellant put his hand under the victim's shirt, fondled his stomach, and pulled the victim's pants and underwear down. The appellant parted the victim's buttocks and attempted to penetrate or slightly penetrated the victim's anus. The victim's mother awoke when she felt the blankets moving in a suspicious manner. She pulled back the blankets and saw that the appellant was lying behind the victim, that the appellant's and the victim's pants were down, and that the appellant had an erection. The victim reluctantly revealed to Mr. Bustamante that the appellant had touched him. Martin, who examined the victim, said that the victim stated that the appellant did "'[s]omething pervertical (sic)'" to him and that the appellant's penis touched his butt "on the inside." Determining the credibility of witnesses is within the purview of the jury. See State v. Millsaps, 30 S.W.3d 364, 368 (Tenn. Crim. App. 2000) (stating that "the weight and credibility of the witnesses' testimony are matters entrusted exclusively to the jury as the trier[ ] of fact"). In the instant case, the jury clearly resolved the issue of credibility in the State's favor. We may not now reconsider the jury's credibility assessment. See State v. Carruthers, 35 S.W.3d 516, 558 (Tenn. 2000). We conclude that there was ample proof to sustain the appellant's conviction of attempted rape of a child.

### III. Conclusion

In sum, we conclude that the trial court did not err in denying the appellant's motion to suppress his statement, that the State did not commit a Brady violation, that the appellant's statement regarding the victim's touching him on a prior occasion in Colorado did not constitute a violation of Tennessee Rule of Evidence 404(b), and that the evidence was sufficient to sustain his conviction. Accordingly, we affirm the judgment of the trial court.

_____
NORMA McGEE OGLE, JUDGE